**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

JACQULYN DAVIS; CHADWICK SMITH;
DAVID EAKER, JR.; FELICIA
YEARWOOD; FRANKLIN VANCE;
BRIAN S. MONTAGUE; SHIRLEY JOSEPH;
STEPHANIE COLEMAN; TOMMY POSEY;
WILLIE NETTLES, JR.; TAMARA "MISTI" EAKER
and WINDELL ASHFORD                                          **PLAINTIFFS**


**VERSUS**                            **CIVIL ACTION NO.:**   1:19-cv-364-HSO-JCG


CITY OF MOSS POINT, MISSISSIPPI;
MARIO KING;
and JOHN DOES 1-5                                           **DEFENDANTS**

                                                    **JURY TRIAL DEMANDED**

---

**COMPLAINT**

---

        COMES NOW PLAINTIFFS by and through undersigned counsel and pursuant to the laws

of the State of Mississippi and files this Complaint against Defendant City of Moss Point, and in

support thereof would show unto the Court the following, to wit:

## I.    PARTIES

1.      Plaintiff JACQULYN DAVIS is an adult resident citizen of Jackson County Mississippi

who may be contacted through undersigned counsel.

2.      Plaintiff CHADWICK SMITH is an adult resident citizen of Jackson County Mississippi

who may be contacted through undersigned counsel.

3.      Plaintiff DAVID EAKER, JR. is an adult resident citizen of Jackson County Mississippi

who may be contacted through undersigned counsel.

1

4.      Plaintiff FELICIA YEARWOOD is an adult resident citizen of Jackson County Mississippi who may be contacted through undersigned counsel

5.      Plaintiff FRANKLIN VANCE is an adult resident of Jackson County Mississippi who may be contacted through undersigned counsel.

6.      Plaintiff BRIAN S. MONTAGUE is an adult resident of Jackson County Mississippi who may be contacted through undersigned counsel.

7.      Plaintiff SHIRLEY JOSEPH is an adult resident of Jackson County Mississippi who may be contacted through undersigned counsel.

8.      Plaintiff STEPHANIE COLEMAN is an adult resident of Harrison County Mississippi who may be contacted through undersigned counsel.

9.      Plaintiff TOMMY POSEY is an adult resident of Jackson County Mississippi who may be contacted through undersigned counsel.

10.     Plaintiff WILLIE NETTLES, JR. is an adult resident of Jackson County Mississippi who may be contacted through undersigned counsel.

11.     Plaintiff WINDELL ASHFORD is an adult resident of Jackson County Mississippi who may be contacted through undersigned counsel.

12.     Plaintiff TAMARA "MISTI" EAKER is an adult resident citizen of Jackson County Mississippi who may be contacted through undersigned counsel

13.     Defendant City of Moss Point is a governmental entity organized and authorized by the laws of the State of Mississippi who may be served with process through Tricia Thigpen, Moss Point City Clerk, 4320 McInnis Avenue, Moss Point, Mississippi 39562.

14.     Defendant Mario King is sued in his official and individual capacity and may be served with process at 4320 McInnis Avenue, Moss Point, Mississippi 39562.

2

15.    Defendants designated as John Does 1 through 5 are, based upon information and belief, certain unknown and unnamed parties who may be liable for the claims asserted herein, who include, but are not limited to, agents, servants, employees, representatives, affiliates, parents, subsidiaries, tortfeasors, joint tortfeasors, contractors, or any other related person or entity of the named Defendants and/or any and all other persons who may be liable to Plaintiffs for the claims asserted herein. Plaintiffs will amend his Complaint once the identities of the unknown Defendants are learned.

## II.    JURISDICTION AND VENUE

16.    Venue is proper because the present action has been commenced against a municipality located in Jackson County.

17.    This action is authorized under federal law and 42 U.S.C. 1983 and made pursuant to the fourteenth and first amendment to the United States Constitution. Plaintiffs' claims are authorized under the ADEA and Title VII of the Civil Rights Act.

## III.    EEOC DOCUMENTS

18.    In support of this action the Plaintiffs have attached the following documents regarding the Plaintiffs' charge of discrimination with the EEOC:

Exhibit A:    Jacqulyn Davis

Exhibit B:     Scotty Montague

Exhibit C:    Franklin Vance

Exhibit D:    Stephanie Coleman

Exhibit E:    Willie Nettles

Exhibit F:    Chadwick Smith

Exhibit G:    David Eaker

Exhibit H:    Windell Ashford

Exhibit I:    Shirley Joseph

Exhibit J:    Felicia Yearwood

Exhibit K:    Tommy Posey

19.     Plaintiffs have filed additional EEOC charges regarding the mayor's retaliatory acts and those charges remaining pending. The Plaintiffs reserve the right to supplement their complaints once hose claims have been administered by the EEOC.

## IV.     FACTUAL ALLEGATIONS

20.     Most Plaintiffs have worked for the City of Moss Point in various capacities.

21.     In July of 2017 Mario King, hereinafter "mayor," became mayor of Moss Point.

22.     During his campaign, the mayor constantly made promises about bringing youth to Moss Point and made many political promises which he simply had no authority to act on, in an effort to win votes in the City.

23.     After the new mayor took office, the atmosphere for many of the older workers within the City changed. The mayor has exhibited a disregard for the law and individual rights of many of his employees, even extending his unlawful behavior to elected officials in the city and the county.

24.     When the mayor took office, one of his first requests was for the human resources department to provide him a list of employees noting their years of service. Shortly after the list was compiled, harassment of many older employees began.

25.     Some employees have refused to cooperate, but the mayor has forced/coerced some employees to make knowingly false and defamatory comments about other employees in order to

convince the board of alderman to take adverse actions against city employees, including lowering their salaries and/or transferring them to other departments.

26. In addition to maliciously forcing employees to attack the integrity and work performance of employees, the mayor has intervened and altered the performance evaluations of employees the mayor is attempting to discharge from their employment with the City. On at least one occasion City employees received an evaluation that the mayor was not happy with, so the employee was later given a lower evaluation by the employee's supervisor, at the request and direction of the mayor.

27. In many instances, as will be discussed further herein, the mayor has sought to use his position to intimidate employees for the benefits of himself, his friends and family in and around the city of Moss Point.

28. The mayor has misused city resources, and despite demands from state agencies that the mayor cease misuse of city resources, the mayor has continued to misuse city resources and punish city employees responsible for reporting the mayor and/or cooperating with state agencies reviewing matters of misuse.

29. The mayor has further utilized his position for personal gain by obtaining benefits from private entities, such as luxury vehicles, gifts, and other benefits not available to ordinary city employees and citizens in Moss Point.

30. The mayor has undertaken to eliminate employment positions within the City so that he can himself receive pay increases, while requesting that the City cut positions because there is not enough money in the budget. Where the board refused to terminate employees, the mayor has stated he would simply harass the employee until they quit. On more than one occasion, the

mayor has followed through his statement that he would harass an employee until they were forced to quit.

31.    In response, the board of alderman have mostly allowed the mayor to operate city government without their oversight, however, at least one alderman has taken legal action against the mayor because of the mayor's abusive behavior.

32.    Since the filing of the original EEOC charge and the EEOC's issuance of the Plaintiffs' right to sue, the Plaintiffs who still work for the City have been subjected to retaliation, suspension and reprimands by the mayor, mostly based upon the mayor falsely accusing the Plaintiffs of insubordination and low work quality.

## V.    ALLEGATIONS OF LAW

33.    Plaintiffs incorporate by reference each of the preceding paragraphs as if they had been fully restated herein.

34.    All acts of the Defendants were under the color and pretenses of the ordinances, policies, practices, customs, regulations, usages and/or statutes of the United States Government, the State of Mississippi and the City of Moss Point.

35.    Each board member, acting in their official capacity as an officer with the City of Moss Point, has chosen to deprive the Plaintiffs of property without due process and in violation of the equal protection clause, evidencing a reckless disregard for the rights of the Plaintiffs.

36.    It is the custom and policy of all Defendants to violate the procedural and substantive due process rights of individuals.

37.    It is the policy and custom of the Defendant to, in violation of Plaintiffs' rights, unlawfully interfere with Plaintiff's rights.

38. Defendants have no reasonable cause to refuse to pay the Plaintiffs, except as means to unlawfully punish Plaintiffs because the current board members have utter contempt for the Plaintiffs and their personal success in life and in their careers.

39. Defendants' actions are in bad faith and were intended and designed to punish Plaintiffs.

40. At all times relevant to this action, Plaintiffs' rights were clearly established. At all times relevant to this action, Defendants violated Plaintiffs' constitutional rights.

41. Defendants' actions evidence malice and/or constitute willful misconduct.

## COUNT I IN VIOLATION OF 42 U.S.C. 1983
### Fourteenth Amendment and Second Amendment

42. Plaintiffs incorporate by reference each of the preceding paragraphs as if they had been fully restated herein.

43. The mayor has forbidden non-police personnel and persons from carrying a firearm at City Hall in Moss Point. The mayor's orders include city employees as well as citizens who visit city hall.

44. Despite the mayor's ban on carrying firearms, the mayor himself carries a firearm on city property, specifically city hall.

45. Upon information and belief, the mayor's firearm ban is not intended to serve any legitimate government interests, rather, the mayor uses his carrying of a firearm as a form of intimidation of employees and others.

46. On at least one occasion the mayor has drawn his firearm and used the firearm to intimidate and harass an employee.

47. The mayor's firearm ban is an infringement of the Plaintiffs' and other persons' Second Amendment right.

48. The mayor's firearm ban is an infringement upon the Plaintiffs' and other persons' rights to equal protection under the law where the mayor gives himself the ability to carry a firearm at city hall, but no other person is allowed to exercise their rights under the Second Amendment.

WHEREFORE Plaintiffs pray for relief against all Defendants as set forth below.

**COUNT II IN VIOLATION OF 42 U.S.C. 1983**
**1st Amendment – Equal Protection**

49. Plaintiffs incorporate by reference each of the preceding paragraphs as if they had been fully restated herein.

**Plaintiffs David Eaker, Posey, Vance and Montague**

50. Plaintiffs Eaker, Posey, and Montague are all long tenured white employees of the Moss Point Fire Department.

51. Each of these Plaintiffs have been ordered by the mayor that they are not to access or post anything on facebook, even though city employees routinely use facebook at work and some city employees even operate private businesses while on city time. Despite these facts, these Plaintiffs have been ordered to refrain from facebook, even though there were no complaints or issues with any Plaintiffs' alleged use of facebook at work, especially where these Plaintiffs rarely used social media at all.

52. In addition, these Plaintiffs have been singled out by the mayor for no legitimate governmental based reason.

53. Each of these Plaintiffs have been informed that they are not allowed to post, fly, or use in any way the confederate flag or any emblems of the confederacy. The mayor has informed the Plaintiffs that they will be fired if they have any association with the confederate flag. These Plaintiffs have had no "association" with the confederate flag other than typical day to day association with emblems such as the Mississippi flag.

54.     Confusingly, no Plaintiff has any history, complaints, or association with the confederate or Mississippi state flag. Instead, the mayor is singling out these Plaintiffs because of their race and infringing on their rights under the 1st Amendment by limiting their free speech rights to use facebook and fly/associate with the flag, if they so desired.

55.     By only placing the aforementioned restrictions on these Plaintiffs, and no other city employees, the mayor and the city are violating these Plaintiffs' rights to equal protection under the 14th Amendment and their 1st Amendment rights in an effort to harass and demean these Plaintiffs.

56.     The unlawful actions of Defendants, as alleged herein, deprived Plaintiffs of their rights to equal protection and free speech. These actions are based upon the Plaintiffs' race, but at the very least, these Plaintiffs constitute a "class of one" wherein the City has arbitrarily treated the Plaintiffs differently from other similarly situated persons within the City.

### **Stephanie Coleman**

57.     Stephanie Coleman was an employee of the City before the new mayor took office in July of 2017.

58.     During the mayor's campaign, Ms. Coleman exercised her free speech rights and complained to members of the local democratic party about the mayor not being a legitimate candidate for the mayoral race because the mayor did not live in the City of Moss Point.

59.     While Ms. Coleman's complaints were accurate, the mayor was elected with the approval of the local democratic party. Upon information and based upon temporal proximity to the harassment discussed further herein, the mayor was angry and upset with Ms. Coleman over her reports to the local party.

60.     The mayor told Ms. Coleman that she needed to be more careful about who she talked to.

61.     After the mayor took office, and as time progressed, the mayor became more hostile towards Ms. Coleman.

62.     After the mayor took office, he began to direct some employees to make false allegations regarding employees whom the mayor was trying to get fired. As was the mayor's practice, anyone who protested or refused would be harassed and attacked by the mayor and his office.

63.     Ms. Coleman made several complaints regarding the mayor's behavior, his harassment, and how his behavior was affecting the public and the operation of City government. These complaints only made the mayor's treatment of Ms. Coleman grow colder and more hostile.

64.     In response to Ms. Coleman's complaints and grievances, Ms. Coleman was reprimanded and eventually forced to resign by the city as a result of Ms. Coleman's complaints and grievances. Prior to discharge Ms. Coleman was continuously reprimanded, harassed, and her compensation diminished by the City.

65.     The Mayor asked the board to terminate Ms. Coleman during executive session two times and the board refused. In August of 2018, the Mayor asked the board to lower Ms. Coleman's salary by $16,000. The board approved the decrease and wanted Ms. Coleman to take on additional responsibilities on top of having taken on additional duties prior with a very limited and much smaller staff that Ms. Coleman had to train daily because the staff was not knowledgeable in their job roles and responsibilities.

66.     Ms. Coleman resigned August 22, 2018 because the board was not providing any protection or assistance to employees against the Mayor. The board was agreeing and allowing him to harass employees. Ms. Coleman could afford the drastic pay cut.

67.     Some of Ms. Coleman's grievances involved the mayor's disdain for Ms. Coleman responding truthfully to request from state agencies regarding the mayor's use, or mis-use, of city resources.

68.     The actions of the City and the mayor were in retaliation for Ms. Coleman exercising her 1st Amendment rights as complained of herein.

**Felicia Yearwood**

69.     Ms. Yearwood was a long tenured employee for the City as a grant writer.

70.     Ms. Yearwood became aware that the mayor was harassing another employee, Dina Singh.

71.     Ms. Yearwood wrote a statement in support of Ms. Singh detailing the harassment that Ms. Singh was enduring at the hands of the mayor. The mayor became aware of Ms. Yearwood's written statement in support of Ms. Singh and the mayor undertook a course of action to retaliate against Ms. Yearwood and intimidate Ms. Yearwood.

72.     Ms. Yearwood's statement was a matter of public concern because of the nature of the mayor's harassment and hostility and its effects on city government.

73.     On Ms. Singh's last day of work, Ms. Yearwood went to say goodbye to Ms. Singh and the mayor walked in and called Ms. Yearwood out of the office and told Ms. Yearwood to stop talking to Ms. Singh. The mayor stood very close to Ms. Yearwood, in such a manner that was intended to intimidate Ms. Yearwood.

74.     The mayor instructed the then city clerk, Stephanie Coleman, to make sure that Ms. Yearwood stopped talking to Ms. Singh.

75.     After these events, the mayor began harassing Ms. Yearwood and undertaking a course of action to remove Ms. Yearwood from her employment with the City, as discussed further herein.

76.     The actions of the mayor were retaliatory and at least in part based upon Ms. Yearwood exercising her first amendment right to report harassment by the mayor of other employees.

77.     As a direct and proximate cause of Defendants' actions, Plaintiffs' rights, as guaranteed by the Fourteenth Amendment, were injured.

WHEREFORE Plaintiffs pray for relief against all Defendants as set forth below.

## COUNT III IN VIOLATION OF 42 U.S.C. 1983
### Equal Protection – Age Discrimination

78.     Plaintiffs incorporate by reference each of the preceding paragraphs as if they had been fully restated herein.

79.     When the mayor ran for office, he ran on a platform of bringing youth to the City of Moss Point. As a general idea, the mayor's campaign was not a violation of the law.

80.     However, after taking office the mayor had undertaken a course of action to remove "non-millennial" employees from their positions with the City.

81.     Ms. Coleman is the only Plaintiff who was under the age of 40, at 38 years old. The mayor even had issues with Ms. Coleman's age because Ms. Coleman was not classified as a "millennial."

82.     The mayor would constantly make derogatory remarks about older employees by using vulgar and obscene language.

83.     On more than one occasion the mayor declared that it would be easier if the older employees would simply die or retire. The mayor has routinely stated his desire that City employees needed to be millennials.

84.     In addition, the mayor has gone to older employees and simply requested that they retire, in lieu of being removed from the City.

85. On Tuesday, September 12, 2017 the mayor emailed staff a statement, which included the line, "If you are in a place where you are no longer able to perform, you are getting angry, taking medication because of work, developed high blood pressure, or your job is a burden to you, it is time to make a tough decision." This email was a direct reference to age elated ailments.

86. In an effort to force the Plaintiffs to retire/resign/be terminated, the mayor has moved employees to various positions for which the Plaintiff/s is not qualified, forcing the employee's evaluations to decline.

87. <u>Windell Ashford</u> - Prior to September of 2018 Ms. Ashford had been moved to several positions within the City. Ms. Ashford was replaced by a millennial in human resources and moved to a secretarial/customer service role. After being moved to a new position, Ms. Ashford was told that the new position was no longer needed, and Ms. Ashford was told that she needed to retire. The mayor said, in specifically referencing Ms. Ashford – that Ms. Ashford was "too old" and that she had "been there too long." Ms. Ashford was replaced and forced to resign by the mayor and the City because Ms. Ashford is over 40.

88. <u>Willie Nettles</u> – Mr. Nettles serves as a building inspector for the City and is over the age of 40. Mr. Nettles is constantly harassed by the mayor, treated differently than younger employees, and threatened by the mayor. On one occasion, the mayor ordered Mr. Nettles to take down a sign on his desk which read "Only God Can Do It." The mayor told Mr. Nettles that "We aren't doing the God thing here." The mayor has removed items from Mr. Nettles's desk, taken away Mr. Nettles computer, reassigned Mr. Nettles, increased Mr. Nettles's physical workload while requiring Mr. Nettles to maintain his administrative roles, and the mayor has told people to watch Mr. Nettles because "he steals." Mr. Nettles is over the age of 40 and is treated and harassed because of his age, wherein the mayor does not harass and treat persons under the age of 40 in

such a harassing and hostile manner. Despite multiple grievances filed by Mr. Nettles, the City has taken no action to prevent the mayor's unlawful actions, discrimination, and retaliation.

89.     Stephanie Coleman – as complained of herein, Ms. Coleman was harassed and targeted, at least in part, by the mayor because Ms. Coleman is not a millennial. The mayor let everyone know that he preferred persons of the millennial age to work for the City. The mayor, as discussed earlier, spoke in vulgar and derogatory terms regarding non-millennial employees, including Ms. Coleman. Ms. Coleman's harassment and termination were based, at least in part, upon her age. Prior to being terminated, Ms. Coleman's pay was dramatically decreased in an attempt to force Ms. Coleman to resign. Because of the pay cut, Ms. Coleman was forced to resign.

90.     Chad Smith – Mr. Smith worked as the superintendent of parks in the Parks and Recreation department. Mr. Smith was over the age of 40 when the mayor took office. Mr. Smith would see the mayor on a regular basis, wherein on some occasions Mr. Smith was told that he did not fit the mayor's "vision" for the City. As discussed previously, the mayor's vision for the City included people under the age of 40 and preferably under the age of 30. The mayor began to alter Mr. Smith's work requirements, taking away many of Mr. Smith's supervisory roles and forcing Mr. Smith to do more manual labor. Eventually the mayor forced the department to hire a young black male to work under Mr. Smith, however, the younger employee was told that he would not have to perform the manual labor required for the job, forcing Mr. Smith to take over much of the manual labor. Mr. Smith attempted to complain to the board about the mayor's actions and the mayor only increased his harassment of Mr. Smith, eventually forcing Mr. Smith to resign in order to prevent the mayor from terminating him and damaging Mr. Smith's otherwise clan employment record.

91.   Felicia Yearwood- Ms. Yearwood was a grant writer who worked for the City for several years. Ms. Yearwood was over the age of 40 when she worked for the City, and by default she did not fit the mayor's vision for the City. The mayor would constantly harass and question Ms. Yearwood, her work and her performance, without any basis. The mayor attempted to mover Ms. Yearwood to less desirable positions in an apparent effort to force Ms. Yearwood to resign. Eventually, the mayor lied to Ms. Yearwood and informed her that the City could not keep her as an employee. The mayor stated that the City could keep on her on a commission basis. In lieu of being terminated Ms. Yearwood accepted the commission-based offer. Once the commission was set to begin, the City quit using Ms. Yearwood to write grants for the City. Ms. Yearwood later learned that although the City could not "afford" to pay her, as represented by the mayor, the mayor himself requested and was given a substantial pay increase. Based upon the derogatory, age-based remarks and the actions of the mayor, Ms. Yearwood's age was a substantial motivating factor in the harassment and discharge of Ms. Yearwood from the City.

92.   Shirley Joseph – Ms. Joseph managed the City's attraction Pelican's Landing beginning in 2001. Ms. Joseph was over the age of 40 when the mayor took office. Given Ms. Joseph's age, she did not fit the mayor's vision for the City. In September of 2018 the mayor moved Ms. Joseph to the Main Street Director position without any training or experience. This move was part of the mayor's standard practice – move someone to a position where they have no experience and provide no training or guidance so that the employee's performance suffers. Unfortunately for them mayor, Ms. Joseph worked hard at her job and did not fail. The mayor told other city workers that Ms. Joseph was worthless, old and dried up, and was not technical enough. The mayor would harass and embarrass Ms. Joseph in front of other people in an attempt to demean and embarrass Ms. Joseph. The mayor has told others within the City that he wants Ms. Joseph gone. Ms. Joseph

15

has been an exemplary for the City and but for her age, the mayor would have no reason to harass and attempt to have Ms. Joseph fired. The mayor has continued to harass and demean Ms. Joseph because of her age.

93.    David Eaker; Franklin Vance, Scott Montague and Tommy Posey – Mr. Franklin, Mr. Montague, Mr. Vance, and Mr. Posey are all employees with the City of Moss Point fire department. Each is white and over the age of 40, a compounded issue for the mayor. The mayor has attempted to replace each of these employees, comprising the entire upper administration, with younger employees. The mayor has tried to lower their salaries and even tried to remove the fire department from the control of city government. The mayor has made multiple disparaging remarks about older employees while in meetings with the Plaintiffs. In addition, the mayor continues to try and alter the payment structure of these employees in an attempt to force the resignation of the older employees. These issues are in addition to the mayor's actions discussed previously herein.

More specifically, in staff meetings with fire department employees the mayor has openly stated that older employees should be done away with and they should move on. The mayor has on multiple occasions asked Chief Posey to retire. As discussed herein, the fire department employees age is a motivating factor in the nearly daily harassment and threats by the mayor. As a result, Chief Posey has been compelled to resign in order to remove himself from the hostile environment.

Additionally, in regard to Mr. Montague, the board of alderman voted on or about Tuesday June 18, 2019 to appoint Mr. Montage as interim chief of the fire department due to Chief Posey's retirement. Mr. Montague is not the mayor's chosen person for the job and as a result the mayor has only increased the verbal harassment of Mr. Montage. More specifically and contrary to the

16

law, the mayor called Mr. Montage on his personal cell phone and told Mr. Montague that if Montague took the interim position there would not be any pay increase, which is a clear misrepresentation of the board's meeting and appointment. The mayor prefers a younger, non-white interim chief. During the phone call the mayor yelled and demanded that Mr. Montague make a decision immediately about accepting the interim position, yelling and being generally condescending towards Mr. Montague. The mayor's deceit and misrepresentations regarding the interim position are retaliatory towards Mr. Montague because of Mr. Montague's age, race, and the prior filing of a charge of discrimination made by Mr. Montague to the EEOC.

Approximately an hour after Mr. Montague informed the city that he would accept the interim chief position, the mayor suspended Mr. Montague for alleged insubordination because Mr. Montague ended the phone call where the mayor was yelling and screaming at Mr. Montague.

Mr. Vance has been subjected to similar specific retaliation in that he has also been suspended by the mayor after the EEOC issued the right to sue in this matter. Mr. Vance had requested that an employee's shift be changed due to a false accusation, an accusation which was proven to be false. Instead of reprimanding the employee for making a false accusation, Mr. Vance was suspended by the mayor for allegedly "retaliating" against the employee for requesting a shift change. The mayor is singling out and retaliating against the Plaintiffs for following the law and making lawful complaints about the mayor's mistreatment.

94.     Jacqulyn Davis – Ms. Davis was over the age of 40 when the mayor took office. When the mayor first took office, Ms. Davis did not experience issues with the mayor until the mayor learned that Ms. Davis was over the age of 40 and had a daughter. Almost immediately upon learning Ms. Davis's age the mayor's treatment of Ms. Davis changed and her working environment become hostile. Since learning Ms. Davis's age, the mayor has attempted to transfer Ms. Davis to other

17

positions and lower Ms. Davis's compensation with the City. The mayor has attempted to have Ms. Davis's position eliminated in an attempt to terminate Ms. Davis, but to date, the board has refused to eliminate Ms. Davis. The mayor has openly stated that if the board will not terminate someone, the mayor will simply harass the employee until the employee quits. The mayor's actions are illustrative of his prior comments.

After the EEOC issued Ms. Davis a right to sue letter, the mayor has become more hostile towards Ms. Davis – including increasing her workload, altering job responsibilities, and reprimanding Ms. Davis for "insubordination" and poor work performance. The mayor has denied Ms. Davis training opportunities in an effort to set Ms. Davis up to fail in her job.

95.     In its EEOC response the City pointed out that the City has hired and employs other non-millennial employees. The City failed to note that just because the other employees did not file a formal complaint, does mean that these other employees are not harassed by the mayor. In addition, some of these other "non-millennial" employees are the mayor's "yes" employees who do not question any request by the mayor, even if the request being made by the mayor in unlawful.

### COUNT IV IN VIOLATION OF 42 U.S.C. 1983
### First Amendment – David Eaker Misti Eaker

96.     Plaintiffs incorporate by reference each of the preceding paragraphs as if they had been fully restated herein.

97.     Plaintiffs Misti and David Eaker are husband and wife.

98.     David Eaker is employed by the City in the fire department.

99.     The City, including the mayor, has become aware that Ms. Eaker has sought documents and information regarding misconduct by the mayor and misuse of city funds and resources. The mayor, specifically, has voiced his displeasure with Ms. Eaker's request for information regarding budgets and spending.

100.    Ms. Eaker has also made complaints about the mayor's conduct and raised issues with the City's refusal to provide official budget reports and other documents.

101.    Ms. Eaker has filed complaints with the ethics commission over the City's failure to provide accurate budget records, wherein the City has only provided doctored/altered records which dot match records presented at meetings.

102.    The mayor has openly addressed Ms. Eaker and slandered Ms. Eaker during board meetings, to which Mr. Eaker has stood up to the mayor for misrepresenting the truth to the public about Ms. Eaker. Mr. Eaker's comments in support of his wife have angered the mayor.

103.    On December 10, 2018 Ms. Eaker was viewing a property in Moss Point and in route Ms. Eaker drove by the mayor's house, simply out of convenience because the route taken was direct.

104.    While driving by the mayor's house Ms. Eaker noticed the mayor was at home during the day and using a city vehicle which the mayor had previously been told by state agencies not to use as the vehicle's usage was a misuse of city property.

105.    Ms. Eaker slowed down to take a picture of the mayor's blatant violation of the law and apparently the mayor saw and realized that Ms. Eaker was documenting the violation and the mayor confronted Ms. Eaker once the mayor realized who Ms. Eaker was and what Ms. Eaker had been documenting.

106.    The mayor knew from the beginning who Ms. Eaker was, but the mayor in his official capacity began posting to social media that an "unknown" stalker was harassing him and came on his property.

107.    The mayor made threats to Ms. Eaker stating, do not "enter my personal space without expecting personal consequences." Contrary to the non-truths told by the mayor in an attempt to

slander and intimidate Ms. Eaker, Ms. Eaker did not get out of her car and the mayor actually followed and harassed Ms. Eaker.

108. The mayor has utilized social media in an attempt to provoke Mr. Eaker into a confrontation so that Mr. Eaker can be terminated. Mr. Eaker has remained as professional as can be expected in order to avoid giving the mayor ground for Mr. Eaker's termination.

109. In an effort to retaliate against Mr. Eaker for his wife's vocal criticism of the misconduct within city hall, the mayor undertakes to harass and intimidate Mr. Eaker through the fire department and through social media.

110. Ms. Eaker's complaints regarding the mayor's conduct include his use of the living quarters at the fire department as his personal "motel," wherein the mayor has stayed in the same bedroom, overnight, with a woman to whom he is not married. While the mayor has engaged in such unlawful and inappropriate behavior, the mayor has fabricated complaints against the Eakers intended to prevent Ms. Eaker from even visiting her husband at the fire station to drop off food and meals.

111. A non-exhaustive list of activities undertaken by the mayor to harass the Eakers is as follows:

  a. Mayor openly and publicly accused Ms. Eaker of stalking him and his family because she drove down the street he lives on

  b. Mayor filed a false police report against Ms. Eaker alleging she was in his yard (she drove down the street & never got out of her car) and claims to have video from his and his neighbors' security cameras but has not produced the video

c. Mayor posted false statements and pictures of Ms. Eaker on social media advising people to call the police if they saw her, with some people replying he should introduce her to his double clips (guns) and suggesting violence

d. Mayor called Ms. Eaker on her cell phone to tell her he wasn't sending records she had requested and demanding to know why she wanted them

e. Mayor mocked Ms. Eaker's southern accent while he was on the phone with her

f. Mayor has hindered Ms. Eaker's records requests and attending board meetings by telling everyone at city hall that she is stalking him

g. Mayor fabricated complaints against Ms. Eaker to keep her from visiting her husband at the fire department stating that she went upstairs (all family members & friends go upstairs) but has not complained about anyone else's family or friends visiting

h. On a separate occasion, mayor told Tommy Posey that a firefighter had complained about Ms. Eaker being at the fire station but would not disclose the name or complaint or produce evidence (made up)

i. During a meeting between David Eaker (husband), Lee Vance, Scotty Montague, Tommy Posey and the mayor, the mayor told Mr. Eaker he had something really bad against him which was messages from someone who claimed to be related to David/Misti telling the mayor Misti was crazy and out to prove he was embezzling money from the city – all false allegations

j. Mayor stepped out into the road to watch Ms. Eaker drive by city hall and continued to stare her down/intimidate her when she pulled into a business near city hall

21

k.  Mayor tried to have Mr. Eaker fired during executive session following a Board of Aldermen meeting in which David spoke against a statement the mayor made

l.  Mayor imposed during an HR meeting in which the BCs were discussing departmental pay scale and got in Mr. Eaker's face by taking an aggressive step towards him and demanding "Do you have a problem?" to Mr. Eaker

m.  During meeting, mayor threatened to cut Battalion Chief's ("BC") pay because in his opinion they were not saving the city any money

n.  Mr. Eaker filed a grievance against the mayor for his aggressive behavior and creating a hostile work environment which was dismissed by the city attorney, Amy St Pe, stating no one can take action against the mayor

o.  BC's have recently been brought into a meeting with the mayor in which he stated complaints had been filed against them for a hostile work environment but the mayor will not give information about the complaints or allow the BCs to see them

p.  Mayor told Mr. Eaker & other BCs that they are not allowed to be on social media (Facebook, etc.) while they are on the clock or they will be terminated, however, other employees are allowed to be on it and post while they are on the clock at city hall

q.  Mayor has made derogatory comments during several staff meetings pertaining to Mr. Eaker & other BCs including using their names and calling them racist

r.  Mayor has attempted to take authority from Mr. Eaker & BCs to do their jobs at the fire department

s.  Mayor has tried to have fire chief, Tommy Posey, to fire the BCs

22

    t.    Mayor continues to be demeaning, belittling and hostile during most all

         interactions with Mr. Eaker and with other employees as well

WHEREFORE Plaintiffs pray for relief against all Defendants as set forth below.

### COUNT V IN VIOLATION OF 42 U.S.C. 1983 and TITLE VII
### Plaintiffs David Eaker, Vance, Posey, and Montague

112.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully restated herein.

113.    Each Plaintiff hereunder is white.

114.    The Defendants' animus towards these Plaintiffs, at least in part, is based upon these Plaintiffs' race in violation of the equal protection clause and Title VII.

115.    The mayor has made racially charged statements towards these Plaintiffs and has attempted to coerce employees to accuse these Plaintiffs of being racist. Instead of accusing these Plaintiffs of being racist, these individual have actually rebutted the Defendants' accusations that these Plaintiffs are racist. Despite these rebuttals, the mayor continues to accuse and harass the Plaintiffs as being racist simply because these Plaintiffs are white.

116.    The mayor continually tells the Plaintiffs and other employees they are "culturally incompetent" and the culture in the fire department must be changed.  The mayor regularly states he is going to make it mandatory that they attend cultural training.

117.    In City meetings the mayor has openly chastised the Plaintiffs and attempted to harass the Plaintiffs by discussing the confederate flag and using images of Colin Kaepernick in presentations in an attempt to provoke a reaction from the Plaintiffs and others. Unfortunately for the mayor, the Plaintiffs are not the racist individuals who tries the mayor tries to defame them as being.

        WHEREFORE Plaintiffs pray for relief against all Defendants as set forth below.

## COUNT VI IN VIOLATION OF STATE LAW
### Mario King individually

118.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully restated herein

119.    Mario King has consistently complained about not having money in the budget for various government functions or payroll funding. Despite this allegation. The mayor has consistently tried to increase his own salary and benefits packages, including lavish and expensive trips made at taxpayer expense.

120.    In an effort to increase his own salary and afford him the ability to travel at taxpayer expense, Mario King has actively and maliciously sought to terminate employees and force employees to quit, as explained *supra*.

121.    These actions by Mario King are done without lawful intent and are intended to benefit himself, at the expense of the Plaintiffs.

122.    Mario King's actions constitute the torts of malicious interference with employment, intentional infliction of emotional distress, and outrage.

WHEREFORE Plaintiffs pray for relief against Defendant Mario King individually as set forth below.

## COUNT VII – TAX PAYER CAUSES OF ACTION
### Mario King individually

123.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully restated herein.

124. Plaintiffs bring this action on behalf of taxpayers for Moss Point and invite any other citizens to join suit against the Defendant for the recovery of tax amounts and resources misspent and misappropriated by Mario King and members of his administration.

125. The Defendant misspent, misappropriated, and unlawfully expended taxpayer funds and resources in violation of Mississippi and Federal law, and these funds must be repaid by the Defendant and his administrations to the taxpayers of Moss Point.

126. These misappropriated funds and resources include:

a. requiring city employees to work on private events while being paid and compensated by the City of Moss Point:

b. Using city employees/interns as personal drivers;

c. Using city vehicles for personal use;

d. Taxpayer funded trips for personal gain;

e. Use of city resources and funds for personal financial gain through personal events other similar ventures of the mayor and his family;

f. Expansion of contracts and city projects based upon benefits received from private companies; and

g. Misuse of grant monies and resources which have resulted in the suspension/revocation of grants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

1.  Assume jurisdiction over this action;

2.  Declare that Defendants' actions, as herein described, violated Plaintiffs' constitutional rights under the Fourteenth Amendments to the United States Constitution

3.  Appropriate equitable relief including but not limited to prospective injunctive relief, declaratory and other injunctive remedies;

4.  Award Plaintiffs nominal and actual damages for Defendants' violation of their constitutional and statutory rights;

5.  Award Plaintiffs compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

6.  Punitive damages for all claims allowed by law in an amount to be determined at trial;

7.  Pre-judgment and post-judgment interest at the highest lawful rate;

8.  Award Plaintiff his costs of litigation, including reasonable attorney's fees and expenses, pursuant to 42 U.S.C. sec. 1988 and/or 20 U.S.C. sec. 1400 et seq.; and

9.  Grant such other relief to which Plaintiff may be entitled or as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED this the 2nd day of July, 2019.

**JACQULYN DAVIS; CHADWICK SMITH; DAVID EAKER, JR.; FELICIA YEARWOOD; FRANKLIN VANCE; BRIAN S. MONTAGUE; SHIRLEY JOSEPH; STEPHANIE COLEMAN; TOMMY POSEY; WILLIE NETTLES, JR.; and WINDELL ASHFORD**

**Plaintiffs**

 */s/ Daniel M. Waide*_____
DANIEL M. WAIDE, ESQ.
ATTORNEY FOR PLAINTIFFS

Daniel M. Waide, (MSB#103543)
Johnson, Ratliff & Waide, PLLC
1300 HARDY ST.
PO BOX 17738
HATTIESBURG, MS 39404
601-582-4553 (OFFICE)
601-582-4556 (FAX)
dwaide@jhrlaw.net